[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
INTRODUCTION AND FACTUAL BACKGROUND
On or about January 23, 1980, the defendant Nancy Emonds leased the four bedroom unit known as Apartment 9A Thistle Lane, Enfield, Connecticut from the plaintiff Freshwater Pond Associates, owner of Freshwater Pond Apartments. The property was managed by Creative Management and Realty Co., Inc. and mortgaged and insured under Section 221(d)(4) of the Federal Housing Act. The owner received benefits under the Section 8 Housing Assistance Payments Program from the Enfield Housing Authority.
The lease ran for one year, until January 31, 1981 and was automatically extended for additional one year terms unless thirty days notice was given during the extension period to terminate the tenancy. The rental amount was subject to adjustment depending on the tenant's family income under a recertification program. The tenant lived at the premises for approximately eight years without any- apparent problems.
In 1988, the defendant's husband, defendant James Emonds obtained employment at the complex as an assistant superintendent. He testified that at that time he was not living at the premises with his wife but rather at either 23 Wallace in Enfield or 3 Oak Street, Springfield, Massachusetts. He further testified that he lived with his daughter at 113 CT Page 1915 West St., Manchester in 1989. Mr. and Mrs. Emonds have been married for 27 years, but according to their testimony, not living together for some time. Mr. Emonds did testify that he drove Mrs. Emond's car (she did not have a license), visited his children very frequently, perhaps daily, and received important mail at his wife's apartment. The issue of his residence is the force driving this case.
On or about April 1988, Mr. Emonds said that he saw a document that stated his wife would be evicted. That document received into evidence, was a computer printout dated April 11, 1988 showing account balances. Next to his wife's account was the message "3/15/88, per Tanya, if ever late, get her out, no deals!!! Her husband has been living with her for a year and never reported his income." On June 20, 1988, Mr. Emonds completed a certification form indicating his income, his family's income and that, by implication, he was residing at the apartment. Moreover, he entered into a lease on October 18, 1988 for the term commencing November 1, 1988 to November 30, 1988 for the subject premises at a rental rate of 340.00 per month. Mrs. Emonds was named on the lease and a copy of the lease was delivered to her. According to the witness Ms. Angelica Massetti, Mrs. Emonds refused to sign the document.
Mr. Emonds testified that he signed the certification and the lease for three reasons: (a) his children were going to be evicted, (b) his overtime would be or was taken away and (c) he was getting an inappropriate raise. Mrs. Emonds testified that her husband advised her that he would take over the rental payments. Apparently he paid the new rental rate from August 1988 to January 1989. Mrs. Emonds testified she never knew what the new rental amount was but that her rate was $42.00 per month.
The parties stipulated that at least four notices to quit were issued in 1989. The first on February 13, 1989 followed by suit which was subsequently withdrawn on March 31, 1989. The second on April 25, 1989 was followed by suit that was likewise withdrawn on October 4, 1989. The third on October 16, 1989 and the fourth on November 15, 1989 followed by the instant suit. The parties engaged in a number of pretrial skirmishes. Trial commenced on December 20, 1990, continued to January 10, 15, 17, 1991 and after submission of briefs to February 28, 1991 for argument.
 II.
DISCUSSION
The defendant raised seven special defenses to the CT Page 1916 plaintiff's complaint. This court believes that the third special defense, lack of subject matter jurisdiction, must be addressed first. Simply put, the defendant argues that as the plaintiff terminated the lease by virtue of the October 1989 notice to quit, the November 1989 notice to quit was ineffective as there was no lease to terminate.
Service of a legally sufficient notice to quit is a condition precedent to instituting a summary process action. Webb v. Ambler, 125 Conn. 543, 552 (1939). A notice to quit must be "an unequivocal manifestation by the lessor that he terminates the rental agreement." Messinger v. Laudano,4 Conn. App. 162, 163 (1985). The first issue to decide is whether the rental agreement was indeed terminated by the
October notice to quit. The plaintiffs maintain that the notice to quit was invalid due to a misspelling of the word Enfield ("Enfiled" rather than "Enfield"). Thus, plaintiff that as the address was not accurate, the notice to quit was ineffective and the lease was not terminated. Bridgeport v. Barbour-Daniel Electronics, Inc., 16 Conn. App. 574, 583
(1988) cert. den. 209 Conn. 826 (1988) (hereinafter referred to as "Bridgeport"); DiMauro v. D'Atil, SPH 3966, Spada J., (January 10, 1980) (H-162). Plaintiff's argument falters for several reasons. First, it assumes that the misspelling itself resulted in an invalid notice. Certainly the court has overlooked spelling errors and other scrivener's errors. See, Garcia v. Cleman, SPNH 8211-2882, Foti, J (December 28, 1982) (NH 117; 128); Albini v. Syrosen, SPWA 8408-01610, Barnett, J. (September 5, 1984) (NH-267). In these two cases, Motions to Dismiss for lack of jurisdiction due to an improper notice to quit were denied where the alleged impropriety was a minor misspelling of the defendant's name. See also, Housing Authority v. Wasylkiw, SPH 8011-8366, Satter J. (April 27, 1981) (H-275). The transposition of the two letters "1" and "e" does not in this court's opinion create a situation where any reasonable person could possibly be misled.
The plaintiff's next problem is that it took no action to invalidate the notice. Certainly, if the plaintiff believed the notice to be defective, it could easily have notified the tenant to ignore the notice. The plaintiff has withdrawn notices or suits in the past (see February 28, 1991 stipulation). It is clear that the Bridgeport case is instructive in this matter. In that case, two notices to quit were served with the summary process action based on the second notice. The first notice was untimely served — a fact acknowledged by both parties and as such, could not constitute the basis for a summary process action. The court addressed the issue of the first notice's effectiveness on the lease. If CT Page 1917 the lease was terminated, no rent was owed — only use and occupancy — and the latter notice to quit and suit based on failure to pay rent would fail. See, Tehrani v. Century Medical Center, 7 Conn. App. 301, 305 (1986). The court ruled that as the first notice was defective it did not terminate the existing lease. Bridgeport, supra 582-4. Thus, in that case, the Motion would not lie. The instant case is different, however, as the first notice to quit, not withdrawn, and being clear and unequivocal did, in fact, terminate the lease creating a tenancy at sufferance. That being the case, the instant action must fail since the nonpayment of use and occupancy is not a proper ground for eviction. General Statutes 47a-23(a); Bridgeport, supra, 581.
 B.
This court is mindful that this ruling departs from that rendered by Judge Susco. Plaintiff has, of course, argued that her prior decision is the law of the case. But that rule is not written in stone. Breen v. Phelps, 186 Conn. 86, 99
(1982). This court believes that based upon the testimony and the documents received in evidence and the oral and written arguments of counsel, the prior decision must be reconsidered. Once the landlord terminated the existing lease agreement with the October 1989 notice to quit, the November 15, 1989 notice to quit served no purpose. The tenancy having been terminated, the notice to quit was served too late to terminate for non payment for February 1989 through October 1989. As previously mentioned, it could not terminate for nonpayment for November since no rent was due.
 C.
While the above decision resolves this case, this court feels it must comment on the procedure utilized by the plaintiff in signing a new lease with Mr. Emonds. The document indicates that Mrs. Emonds was named as a party and indeed there was a place for her to sign. Certainly, a novation would be a proper method to discharge the 1980 lease. Indeed it is a term used where a new party is introduced to the contract. Riverside Coal Co. v. American Coal Co., 107 Conn. 40, 44
(1927). The fact remains, however, that the subject property was leased to Mrs. Emonds. Thus, unless she agreed to the substitute lease or had her lease properly terminated, the substitution would be improper. It is clear that she did not expressly agree to the new lease. In fact, from the testimony of plaintiff's witnesses, this court believes that Mrs. Emonds knew the new rental amount and specifically refused to sign the new lease. Plaintiff has argued that Mrs. Emonds ratified the lease — presumably by remaining on the premises. This court CT Page 1918 thinks not. Ratification requires "acceptance of the results of the act with an intent to ratify and with full knowledge of all material circumstances." Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172, 185 (1980), citing Ansonia v. Cooper,64 Conn. 536, 544 (1894). The evidence indicates that Mrs. Emonds was never consulted on the June 1988 recertification — the event that triggered the new lease and the new rental amount. Likewise, the November 1988 recertification was also not signed by Mrs. Emonds. Indeed, the worksheet dated October 11, 1988, indicated the applicant and the tenant was James Emonds. Finally, one year later on October 6, 1989, Mrs. Emonds through her attorney, offered to pay the rent at the old rate of 42.00 per month — not the new rate. This court finds no ratification.
 D.
In addition to ratification, the plaintiff indicates that Mr. Emonds acted as Mrs. Emonds' agent. The underlying facts clearly do not support a finding of agency. Agency is defined as "`the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. . . .' Restatement (Second), 1 Agency 1." Botticello v. Stefanovicz, 177 Conn. 22,25 (1979) citing McLaughlin v. Chicken Delight, Inc.,164 Conn. 317, 322 (1973). "Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. Restatement (second), 1 Agency 1 comment b (1988)." Id.
Moreover, the existence of the agency relationship is a question of fact with the burden on proving agency on the plaintiff. Id., 26. Marital status cannot in and of itself prove the agency relationship. Commission on Human Rights and Opportunities v. Veneri, 157 Conn. 20, 24 (1968). Mr. Emonds testified he was signing the documents on his own without his wife's knowledge. He indicated that he signed the lease under duress. Never once did he sign for his wife as agent. Finally, there is absolutely no testimony that Mrs. Emonds knew of the June recertification which led to the rental increase. Like the facts in Botticello supra, there is nothing here to support an agency finding. As stated by that court, "the fact that one spouse tends more to business matters then the other does not, absent other evidence of agreement or authorization constitute the delegation of power as to an agent." Id., 27. This principle is underscored by the situation herein where Mrs. CT Page 1919 Emonds was the sole adult tenant for eight-years. This is not a situation where the husband and wife were living together, signing papers together and where there was no question about their relationship for a period of time. In this case, everything marshals against that premise. Indeed, the plaintiff's own register of superintendents shows Mr. Emonds' address as other than 9A Thistle Lane, Enfield; To suggest that Mr. Emonds tended to all of Mrs. Emonds' business affairs is not borne out by the facts.
Thus, the court is left with a 1988 lease purported to be a novation but neither ratified nor approved by the original party. Like Mr. Stefanovicz in Botticello, supra, the agreement is not only not binding on Mrs. Emonds, the agreement is invalid. "A lease transfers an estate in real property to a tenant for a stated period, with a reversion in the owner after the expiration of the lease. Its distinguishing characteristic is the surrender of possession by the landlord to the tenant so that he may occupy the land or tenement leased to the exclusion of the landlord himself. "Monarch Accounting Supplies, Inc. v. Prenoso, 170 Conn. 659, 665 (1976) citing Jo Mark Sand Gravel Co. v. Pantanella, 139 Conn. 598, 601, (1953). And where the entire premises are leased, in the absence of any agreement, either expressed or implied or by covenant to the contrary, the tenant has the right of exclusive possession and control of the entire premises. . . ." Monarch, supra, citing Central Coat Apron Linen Service, Inc. v. Indemnity Ins Co., 136 Conn. 234, 237 (1949). The landlord had no estate to transfer to Mr. Emonds. Obviously, Mrs. Emonds is not bound to the increased rental amount.
 E.
The court is aware that there are a number of other issues raised by the parties. This court need not reach those other issues having reached the above conclusion.
 III.
Conclusion
Judgment of Dismissal to enter for defendant Nancy Emonds. Plaintiff has failed to make out a prima facie case.
Berger, J.